**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-1234
_____

UNITED STATES OF AMERICA

v.

DAMIEN GIBSON,

Appellant

_____

On Appeal from the United States District Court for the
Western District of Pennsylvania
(District Court No.: 2-15-cr-00256-008)
District Court Judge: Honorable Cathy Bissoon

_____

Submitted under Third Circuit LAR 34.1(a)
on April 22, 2020

(Opinion filed: June 10, 2020)

Before: HARDIMAN, RENDELL and FISHER, <u>Circuit Judges</u>

———————

O P I N I O N*

———————

**RENDELL**, *Circuit Judge*:

Damien Gibson appeals his conviction of conspiracy to possess with intent to distribute and distribute less than 500 grams of cocaine as well as his resulting sentence. He specifically challenges the District Court's denial of his motion for judgment of acquittal, arguing the evidence was insufficient to support the conviction. He also objects to the District Court's finding that he was convicted of summary harassment in 2014, which increased his criminal history score. Because we conclude that neither challenge has merit, we will affirm.

## I.    Background

In 2015, the FBI's Safe Streets Task Force was investigating cocaine trafficking in and around Pittsburgh under the leadership of Special Agent John Orlando. The Task Force became aware of Appellant Damien Gibson in the course of their investigation into distributer William Chaffin.

In August 2015, the Task Force obtained wiretap authorization under Title III and targeted Chaffin's cellphone. Task Force officers began to monitor Chaffin's communications, including those with a number ending in 8571, which officers learned

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

belonged to Damien Gibson.  On August 15, that number texted Chaffin "1+1," which Agent Orlando knew, from earlier controlled purchases from Chaffin, referred to how many ounces of cocaine the customer wanted.  Agent Orlando understood Gibson's text to be a request for one ounce of crack and one ounce of powder cocaine.

On August 18, at 6:55 pm, Gibson texted that he was "up here at happy hour." Supp. App. 121, 297.  Chaffin was running late, and after exchanging text messages about the delay, Chaffin called Gibson at the 8571 number, and Gibson complained about having to wait.  At 10:04 pm, Chaffin received another text from Gibson's 8571 number, complaining that he was "still here at this damn bar waiting on u" and moments later noting that someone was waiting for Chaffin to pay the DJ.  Supp. App. 133, 135, 300. Officers believed these comments referred to the 1313 Tavern, which Chaffin managed, and a surveillance camera confirmed that Gibson was at the 1313 Tavern that night and stepped outside to take a phone call.  The surveillance footage also showed that Chaffin eventually picked Gibson up and parked two blocks away, where the two sat for a few minutes before Gibson left in his own car.

On August 19, 2015, Gibson called Chaffin, and Chaffin asked whether he could give Gibson's number to someone named "Meech."  Gibson said no, explaining, "I got a different number for that, man, . . . this is my family line. . . . that'd defeat the purpose if I[ ] do it to this line."  Supp. App. 370.  He noted that the 8571 number was only for his brothers, cousins, daughter, and son, but assured Chaffin that he would give "Meech" his "throw away number" the next time he saw him.  Supp. App. 370-71.

3

Gibson and Chaffin met on several other occasions. On August 21, 2015, Chaffin called Gibson, and the two attempted to arrange a meeting. At 4:09 pm, Gibson texted Chaffin "1." After some delay, the two agreed to meet at a gas station, and surveillance confirmed that this meeting occurred. On August 25, 2015, the two again agreed to meet, and Chaffin was late. Gibson complained that he had to wait for 45 minutes and was "startin to look funny as hell." Supp. App. 309-10. They then arranged to meet at an alternate location. On August 29, Gibson called Chaffin, they arranged to meet, and Gibson texted Chaffin "1+1." Surveillance confirmed that Chaffin then drove to Gibson's house.

On September 11, 2015, the two met again. Gibson initially texted Chaffin "1+1." After Chaffin was late meeting Gibson, they spoke on the phone, and Chaffin agreed to come to the movie theater where Gibson was. In that conversation, Gibson said he was going to send Chaffin a text message and told Chaffin to look at his texts. After hanging up, Gibson texted Chaffin "4 ½," which Agent Orlando recognized as a term used in a previous controlled buy to refer to 4.5 ounces, or an eighth of a kilogram of cocaine. At 2:46 pm, Chaffin called Gibson to say he was waiting in front of the theater. At the same time, Allegheny County Police Detective Lane Zabelsky was surveilling the front parking lot of the theater. After Chaffin's call, Detective Zabelsky saw Gibson walk out of the theater, speak briefly with Chaffin, who was on a motorcycle, and then reach into the saddlebag on the motorcycle and remove a small object. Gibson went back into the theater, and Chaffin drove away.

4

On September 17, 2015, Gibson again texted Chaffin "4 ½." When Chaffin did not respond to numerous messages, Gibson texted Chaffin, "I worked 4 1/2 hours at the door last ni[ght]." Supp. App. 159, 330. Orlando inferred that this was a way of again requesting 4.5 ounces of either cocaine or cocaine base, because surveillance footage showed that Gibson only went to the 1313 Tavern for minutes at a time unless waiting for Chaffin, and as far as Agent Orlando was aware, Gibson was not employed at all. On September 21, 2015, Gibson again texted Chaffin "1+1." The two continued to communicate in October, including one instance when Gibson asked Chaffin to "hit me as soon as possible" because Gibson had "bills" to pay. Supp. App. 372.

Gibson was arrested on December 9, 2015, and a cellphone recovered from him contained contact information for Chaffin. The Task Force never conducted a search of Gibson's home, but in Chaffin's house they found evidence that he had been converting cocaine powder into crack.

In December 2015, Gibson and sixteen others, including Chaffin, were indicted for conspiracy to possess with intent to distribute and distribute less than 500 grams of cocaine from approximately June 2015 until November 2015. Gibson was jointly tried with one co-defendant, Keith Thomas, in August 2018. At trial, the prosecution produced evidence to show the foregoing facts, relying heavily on the surveillance footage, recorded calls, and text messages. Agent Orlando also interpreted some of the language in the text messages and calls, and Pennsylvania State Police Trooper Michael Warfield testified as a drug-trafficking expert, interpreting some additional language.

The District Court denied Gibson's motion for judgment of acquittal, as well as his renewed motion. The jury then convicted him of the one count of conspiracy.

At sentencing, Gibson objected to the calculation of his Sentencing Guideline range. The District Court calculated the range by including a prior conviction for summary harassment, but Gibson denied having suffered that conviction. After hearing from the probation officer who wrote the Presentence Report and from Gibson, the District Court chose to apply its calculated range.

## II. Discussion

On appeal, Gibson challenges the sufficiency of the evidence and the District Court's determination at sentencing that he had been convicted of summary harassment. Because the District Court properly denied Gibson's motion for judgment of acquittal and did not clearly err in finding that Gibson was convicted of summary harassment, we will affirm.

### A. Sufficiency of the Evidence

First, Gibson contends that the evidence was insufficient to sustain the verdict of guilt on the count of conspiracy to possess with intent to distribute less than 500 grams of cocaine. We review the denial of a motion for judgment of acquittal *de novo*. *United States v. Repak*, 852 F.3d 230, 250 (3d Cir. 2017). "In reviewing a jury verdict for sufficiency of the evidence . . . we must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (quoting *United States v. Lore*, 430 F.3d 190,

6

204 (3d Cir. 2005)). Because there was plenty of evidence from which a rational juror could find Gibson guilty beyond a reasonable doubt of conspiracy to possess with intent to distribute and distribute less than 500 grams of cocaine, the District Court rightly denied the motion for judgment of acquittal.

To convict Gibson of conspiracy, the jury had to find beyond a reasonable doubt: (1) a shared unity of purpose between co-conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal. *Id.* at 156.[1] The evidence revealed extensive communications between Gibson and Chaffin—a known distributor of crack and powder cocaine—using language that, according to the testimony of multiple witnesses, referred to drug quantities.[2] The government introduced evidence that between August 15 and September 21, 2015, Gibson requested 14 ounces—almost 400 grams—of cocaine from Chaffin. Further, Gibson was often anxious about his meetings with Chaffin, had a separate "throw away" phone number for this activity, Supp. App. 370-71, and referred to "bills" he had to pay as the reason he needed the cocaine soon, Supp. App. 372. The jury could certainly have found from this evidence that Gibson was

---

[1] Gibson argues in part that the prosecution failed to prove possession beyond a reasonable doubt. But actual possession is not an element of the conspiracy offense, as the Court properly instructed the jury. *See id.*; 3d Cir. Model Crim. Jury Instr. §§ 3.03, 6.21.846B; App. 608-13.

[2] Some of Gibson's arguments suggest that we should not credit the lay and expert opinion testimony interpreting the language of the text messages and calls. But Gibson has never challenged the admissibility of this testimony. He challenges only the sufficiency of the evidence, and in reviewing that challenge, we "must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (citation omitted).

guilty beyond a reasonable doubt of conspiracy to possess with intent to distribute and distribute less than 500 grams of cocaine.

### B. *Criminal History Calculation*

Gibson next argues that the District Court erred when, at sentencing, it determined he had been convicted of summary harassment for purposes of calculating his criminal history score. Sentencing courts may rely on facts the government proves by a preponderance of the evidence. *United States v. Berry*, 553 F.3d 273, 280 (3d Cir. 2009). If the prosecution meets that burden, the defendant has the burden of producing credible evidence to rebut the prosecution's evidence. *See United States v. Gray*, 942 F.3d 627, 631 (3d Cir. 2019). We review the District Court's factual decisions regarding criminal history calculations for clear error. *Id.* at 630-31; *United States v. Audinot*, 901 F.2d 1201, 1202 (3d Cir. 1990).

Given the evidence presented to the District Court, we cannot conclude that the Court clearly erred in finding Gibson was convicted of summary harassment. Gibson's PSR indicated that he had been convicted of harassment in Pennsylvania Magisterial District Court in May 2014 following a fight with an ex-girlfriend. The conviction increased Gibson's criminal history score by one point, resulting in a score of four and criminal history category of III. Gibson objected to the PSR, denying that he was found guilty of harassment. After considering testimony from both parties, the District Court determined that a preponderance of the evidence showed Gibson was convicted of summary harassment.

The District Court did not clearly err in finding that the government had shown Gibson was convicted of summary harassment. The Probation Office explained, in response to Gibson's objection, that after the 2014 incident with Gibson's ex-girlfriend, some charges were withdrawn and Gibson pled guilty to one summary count of harassment, which was moved to the non-traffic docket. Although the non-traffic court records had been destroyed, the Probation Office stated that it had confirmed the movement of the case to the non-traffic docket and the imposition of fines and costs through a call to the Magisterial District Court.

At the sentencing hearing, U.S. Probation Officer Kristie McVay, who had prepared the PSR, corroborated this account. She testified that she had first examined Gibson's rap sheet, which indicated that he had been convicted of harassment. She then looked to the docket, and when the public docket showed only that the matter had been moved from the criminal docket to the non-traffic docket, she contacted the Magisterial District Judge's chambers. A staff member in the Judge's chambers confirmed that the docket number represented the harassment charge. When asked on cross-examination if she had anything to show Mr. Gibson was convicted of harassment, McVay stated that his rap sheet and her conversation with the Magisterial Judge's staff confirmed the conviction.

The Court also heard from Gibson but did not find that he offered credible evidence that he was not convicted of harassment. Gibson testified that, in Magisterial District Court, the ex-girlfriend involved in the offense had admitted to lying about the incident. According to Gibson, the Judge imposed a fine on the woman for lying, and

9

Gibson paid the fine for her because she could not afford it. Gibson claimed he did not plead guilty to any crime and that it was his understanding that all the charges against him had been dropped. The District Court considered this testimony, but concurred with the Probation Office's assessment, concluding that a preponderance of the evidence showed the conviction occurred.

Despite Gibson's arguments to the contrary, the District Court did not clearly err in crediting Probation Officer McVay's testimony. Gibson criticizes the testimony as speculative and dependent on hearsay. Because the Federal Rules of Evidence do not apply in sentencing proceedings, however, hearsay evidence need only have minimal indicia of reliability to be considered. *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007). The District Court could certainly have found such minimal indicia of reliability satisfied by Probation Officer McVay's account of her call to the Magisterial Judge's chambers.

Gibson nonetheless insists that the non-traffic docket number could not have reflected the harassment conviction noted on the rap sheet and in the presentence report. Gibson primarily points to the fact that the relevant public records of the conviction did not exist or had been destroyed, and the destruction of such records would have violated Pennsylvania's expungement statute, 18 Pa. Cons. Stat. § 9122(b). In Gibson's view, this conclusively showed that the non-traffic docket number could not represent the harassment conviction, and therefore no conviction occurred. We disagree. However unusual, or even improper, it may be that the public records are no longer available, that fact alone does not prove that the conviction did not occur, nor does it show that the

chambers' staff member's statement was unreliable. The District Court did not err in crediting the testimony that, although the records of the conviction were destroyed, the conviction nonetheless occurred. The District Court considered the rap sheet and docket, heard testimony from both the Probation Officer and the defendant, and credited the Probation Officer's account rather than Gibson's. In doing so, it did not clearly err.

## III.  Conclusion

For the foregoing reasons, we will affirm.